# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

COURTNEY SILVERMAN,

          Plaintiff,

    v.

MOVE INC, et al.,

          Defendants.

Case No. 18-cv-05919-BLF

**ORDER GRANTING WITHOUT LEAVE TO AMEND NATIONAL ASSOCIATION OF REALTORS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION; GRANTING MOVE, INC'S AMENDED MOTION TO COMPEL ARBITRATION; STAYING ACTION AND VACATING CASE MANAGEMENT CONFERENCE**

[Re: ECF 25, 37]

Before the Court are two motions: (1) Defendant National Association of Realtors' ("NAR") Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim (MTD, ECF 25); and (2) Defendant Move, Inc.'s ("Move") Amended Motion to Compel Arbitration and to Dismiss, or in the Alternative, to Stay, the Case (MTC, ECF 37). For the reasons discussed below, NAR's motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND, and Move's motion to compel arbitration is GRANTED. The case is STAYED pending arbitration, and the initial case management conference set for July 18, 2019 is VACATED.

## I.   BACKGROUND

In this putative class action, Plaintiff Courtney Silverman alleges a single cause of action against Defendants NAR and Move for advertising text messages that violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. *See* First Am. Compl. ("FAC") ¶¶ 78–84, ECF 56. Plaintiff, a citizen and resident of Florida, is a licensed real estate sales associate and a member of NAR. FAC ¶ 8. NAR, an Illinois corporation, owns and promotes the domain

realtor.com, which NAR describes as its official website.  FAC ¶¶ 2, 12.  Realtor.com has its headquarters in California.  FAC ¶ 14.  Realtor.com is the promotional hub for NAR and its members, which allows realtors to market homes to consumers and allows realtors to develop leads on consumers' behalves.  FAC ¶¶ 15, 29–32, 45.  NAR provides numerous resources, services, and benefits for its members through Realtor.com.  FAC ¶¶ 33–34.

Move, a California corporation, operates the website for NAR under a licensing agreement.  FAC ¶¶ 3, 11, 20.  In 1996, NAR and Move entered into a "strategic partnership" via a perpetual marketing agreement and trademark license through which Move operates Realtor.com.  FAC ¶ 22.  This agreement is governed by California law.  FAC ¶ 23.  Through this agreement, NAR engaged Move to promote Realtor.com and its services to real estate professionals, which includes the text messages at issue in this action.  FAC ¶ 24.  While Move operates Realtor.com, ultimately NAR has control over the site and final approval over the site's advertising and branding.  FAC ¶¶ 36, 46.  Move has stated in its SEC filings that NAR has "significant influence" over its corporate governance, including that the two companies share confidential information, officers, board members, logos, and approve some of each other's mergers and directors.  FAC ¶ 35.

Move and NAR, jointly and as agents of one another, allegedly sent unsolicited advertising text messages to real estate professionals, including Plaintiff and the putative class, who were members of NAR, in order to promote Realtor.com and its services.  FAC ¶¶ 4–6, 19, 25, 44, 48, 49, 54.  Defendants had previously obtained the cellphone numbers of Plaintiff and the class and "purportedly their consents" to receive emails from Realtor.com.  FAC ¶¶ 49–51.  This agreement also allowed members to opt out or unsubscribe from such messages.  FAC ¶ 55.  Pursuant to the agreement, Plaintiff and the class members unsubscribed, but Defendants continued to send the text messages.  FAC ¶¶ 56–62.

Based on Defendants' actions, Plaintiff filed her Complaint here on September 26, 2018, asserting a single TCPA claim.  *See* ECF 1.  She brings this claim on behalf of a nationwide class of individuals defined as, "[w]ithin the applicable statute of limitations, all persons in the United States to which and to whom Defendants sent or caused to be sent a text message stating 'realtor.com' using an ATDS after receiving the reply text message: 'Stop.'"  FAC ¶ 70.  Excluded

from the class are those who entered into arbitration agreements with Move that had not yet expired. FAC ¶ 71.

On December 10, 2018, NAR filed its motion to dismiss for lack of personal jurisdiction and failure to state a claim. ECF 25. Plaintiff never opposed this motion. On the same day, Move filed a motion to compel arbitration. ECF 27. On December 20, 2018, the Court granted the parties' stipulation to extend Plaintiff's deadline to oppose the motions to January 23, 2019. ECF 31. On January 23, 2019, Move filed an amended motion to compel arbitration, which is at issue here. ECF 37. On January 28, 2019, without moving for leave of Court or obtaining a stipulation from Defendants, Plaintiff filed an amended complaint. ECF 41. On March 6, 2019, the Court granted Defendants' motion to strike Plaintiff's amended complaint. ECF 50. On March 7, 2019, Plaintiff moved for leave to amend her complaint (ECF 51), which Defendants opposed. On March 22, 2019, Plaintiff opposed Move's amended motion to compel arbitration. ECF 53.

On April 2, 2019, the Court granted Plaintiff's motion for leave to amend and converted the two pending motions pertaining to the Complaint into motions pertaining to the First Amended Complaint ("FAC"). ECF 55. Because Move had not yet filed its reply in support of its motion to compel, the Court directed Move to address the FAC in its reply and gave Plaintiff the opportunity to file a sur-reply. *Id.* Because Plaintiff never opposed NAR's motion to dismiss, the Court gave NAR the opportunity to file a supplemental brief in support of its motion to dismiss and declined to give Plaintiff the opportunity to respond to this supplemental brief. *Id.* To resolve NAR's motion, the Court will consider arguments Plaintiff made in her motion for leave to amend as they relate to NAR's motion to dismiss. *See* MLTA, ECF 51. On May 23, 2019, the Court held a hearing on the motions. ECF 62.

## II. MOTION TO DISMISS

NAR moves to dismiss Plaintiff's claim because this Court does not have personal jurisdiction over NAR and because Plaintiff fails to state a claim against NAR. *See generally* MTD. Because the Court agrees that it does not have personal jurisdiction over NAR, it does not address NAR's Rule 12(b)(6) arguments.

### A.    Legal Standard

Federal Rule of Civil Procedure 12(b)(2) authorizes a defendant to seek dismissal of an action for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (internal quotation marks and citation omitted). Uncontroverted allegations in the complaint are taken as true, *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004), and factual disputes contained within declarations or affidavits are resolved in the plaintiff's favor, *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).

Under Federal Rule of Civil Procedure 4(k)(1)(A), this Court has personal jurisdiction if the defendant would be "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," *i.e.*, California. Because California's long-arm statute is coextensive with federal due process requirements, the Court may exercise personal jurisdiction so long as it comports with due process. *See Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). "[D]ue process requires that the defendant 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Ranza*, 793 F.3d at 1068 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### B.    Discussion

The Court first discusses additional relevant facts and then the parties' arguments here.

#### 1.    Additional Facts

As discussed, Plaintiff is a citizen and resident of Florida and a member of NAR. FAC ¶ 8. NAR is an Illinois corporation. FAC ¶¶ 2, 12. NAR's website shows that its home office is in Chicago, IL. McGrath Decl., Ex. 1, ECF 25-1. Realtor.com has its headquarters in California. FAC ¶ 14. NAR provides numerous resources, services, and benefits for its members nationwide through Realtor.com. FAC ¶¶ 33–34.

NAR allegedly "transacts substantial business in, and has maintained continuous and

systematic contacts in and with, California generally and specifically relating to marketing its official moniker, website, REALTOR marketing hub, and brand, 'Realtor.com' in and from California, from which the text messages at issue were sent." FAC ¶ 12. This business includes NAR's "strategic partnership" with Move, starting with the 1996 perpetual marketing agreement ("1996 Agreement") that sets forth the relationship between the parties. FAC ¶ 22; McGrath Decl., Ex. 2 ("Agreement").[1] The 1996 Agreement discusses the terms of how Move will operate Realtor.com and sets forth the relationship of the parties:

> This agreement is not intended to create, and shall not be deemed or treated as creating, a partnership, joint venture, employment contract or any other relationship between the parties other than the service relationship expressly provided for in this Agreement. All commitments, obligations, undertakings and liabilities associated with the [operation of Realtor.com] shall be entered in the name of, and shall be the sole responsibility of, [Move][2], and neither party shall be authorized to enter into any commitment, obligation, undertaking or liabilities in the name of, or on behalf of, the other party.

Agreement ¶ 3.4.

The 1996 Agreement also makes Move responsible for carrying out Realtor.com's marketing program:

> [Move] shall be responsible for developing and implementing a program to identify Authorized Advertisers for the System and to solicit advertisements from such Persons; and [Move] shall be responsible for carrying out such program. [Move] shall be responsible for the costs of soliciting such advertising, setting such advertisements up on the System in compliance with the requirements set forth in Section 5.7, and collecting revenues associated therewith . . . . No Advertising shall indicate that a product or service is endorsed or sponsored by NAR or RIN unless the advertiser has been authorized to do so by NAR or RIN, as the case may be.

*Id.* ¶¶ 5.7(b) and (c).

The 1996 Agreement states that California law governs it and that the venue for disputes under it shall be California. *Id.* Sched H, ¶ 12; FAC ¶ 23. The 1996 Agreement also provides that NAR has ultimate authority to approve the advertising plan; that NAR may audit the marketing process; that Move must open its records to NAR; that Move must prepare a business plan related

---

[1] The Court takes judicial notice of this document because it is incorporated by reference in the FAC. *See* FAC ¶ 22; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)

[2] Through its subsidiary, RealSelect, Inc. *See* McGrath Decl., Ex. 3.

to its efforts on NAR's behalf; and other related oversight provisions.  FAC ¶ 36 (citing 1996 Agreement).

Apart from Realtor.com, NAR has other significant ties to California.  "NAR and its constituent board and state associations form a composite organization of brokers and salespeople, including, as of November 2018, approximately 200,000 NAR members in California, which is the state with the most NAR members in the United States."  FAC ¶ 17.  Certain California real estate associations were founding members of NAR many decades ago.  FAC ¶ 16.  NAR is registered with the California Secretary of State; has bylaws and a constitution adopted in California; has marketing agreements with various California entities, including Move and Realtor.com; sets operational standards for California Realtor associations; regularly conducts business in California, including through its approximately 200,000 California members; holds regular meetings and events in California; has had several presidents and officers who hail from California; and maintains a regional vice president in California.  FAC ¶ 18.

## 2. Discussion

Plaintiff argues that the Court has general personal jurisdiction over NAR; she does not argue that the Court has specific jurisdiction over NAR.  *See generally* MLTA.  The Court first discusses general jurisdiction law and then analyzes the facts here.

### a. General Jurisdiction Law

The Supreme Court has recognized two types of personal jurisdiction: (1) general (or all-purpose) jurisdiction and (2) specific (or case-specific) jurisdiction.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 927 (2011).  General jurisdiction is based on certain limited affiliations that the defendant has with the forum state.  *Id.* at 919.  A court may exercise general jurisdiction only when the defendant's "affiliations with the State are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State."  *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *Goodyear*, 564 U.S. at 919).  In the paradigmatic circumstance for exercising general jurisdiction, a corporate defendant is incorporated or has its principal place of business in the forum state.  *Id.* at 760.

The Ninth Circuit recently articulated the general jurisdiction standard in *Williams v.*

*Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017). First, it described in detail the Supreme Court's 2014 ruling in *Daimler*, in which the Supreme Court held that Daimler, a German public stock company, was not "at home" in California based on the activities of its subsidiary in California. The Ninth Circuit summarized *Daimler* as follows:

> In [*Daimler*], the Supreme Court considered for the first time "whether a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary." The plaintiffs sought to sue Daimler, a German corporation, in California on the basis that Daimler's subsidiary's contacts could be attributed to Daimler under an agency theory, thereby establishing Daimler's "continuous and systematic" presence within California. Daimler's subsidiary, MBUSA, served as Daimler's exclusive U.S. importer and distributor and had multiple California facilities. We found general jurisdiction over Daimler under an agency theory, applying a test that asked whether MBUSA's services were "sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." [Citing 9th Circuit *Daimler* decision].
>
> The Supreme Court reversed our finding of general jurisdiction, emphasizing that the test for general jurisdiction asks whether a corporation is essentially "at home" in the forum state. The Supreme Court assumed that MBUSA could be considered "at home" in California, and that its in-state contacts could be attributed to Daimler, but it rejected a theory that would permit "the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business.'" In so doing, the Court noted that while general jurisdiction is not strictly limited to a corporation's place of incorporation or principal place of business, those exemplars illustrate the need for predictability in jurisdiction and "afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims."

*Williams*, 851 F.3d at 1020–21 (citations omitted) (quoting *Daimler*).

The Ninth Circuit then described its more recent case law, in which it recognized that *Daimler* had "invalidated our previous 'agency' test," but had "left intact' the alternative 'alter ego test for "imputed" general jurisdiction.'" *Id.* at 1021 (quoting *Ranza*, 793 F.3d 1059). It then set forth the alter ego test, first noting that the "parent-subsidiary relationship does not on its own establish" that two entities are alter egos. *See id.* Instead, to prove alter ego, "a plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Id.* (quoting *Ranza*, 793 F.3d at 1073).

Finally, the *Williams* court noted that when talking about a corporation's sales or activity

United States District Court
Northern District of California

in a forum state, "the general jurisdiction inquiry examines a corporation's activities worldwide—not just the extent of its contacts in the forum state—to determine where it can be rightly considered at home." *Id.* at 1021–22 (quoting *Ranza*, 793 F.3d at 1073). Because the defendant in *Williams* had offices all over the world and made sales all across North America, the *Williams* court held that the plaintiffs had not show the defendant was at home in California. *See id.* Similarly, the plaintiffs had failed to plead facts sufficient to satisfy the alter-ego test. *Id.*

b. *Analysis*

As in *Williams*, Plaintiff has failed to plead or submit facts sufficient to show that NAR is at home in California. First, NAR is neither incorporated nor has its principal place of business in California. FAC ¶¶ 2, 12; McGrath Decl., Ex. 1. So Plaintiff must show that this is the "exceptional case" in which a corporate defendant's contacts with a state in which it is not incorporated and does not have its headquarters are so "continuous and systematic" as to render the state the "one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Daimler*, 571 U.S. at 137, 139 n.19. Plaintiff does not satisfy this exacting standard.

NAR's contacts with California can fairly be grouped into two categories: (1) its contacts with Move/Realtor.com; and (2) its contacts with its members and other business operations in California. Neither category, either independently or combined, is sufficiently continuous and systematic as to render NAR at home in California.

As to Move and Realtor.com, Plaintiff has not demonstrated that Realtor.com is such a substantial portion of NAR's business as to render NAR at home in California. Though Realtor.com is headquartered in California, through the site NAR provides services to its members throughout the country. FAC ¶¶ 33–34. Moreover, NAR provides additional services to its members that do not rely on the site itself or on Move's operations of the site. *See* FAC ¶ 18. Though some or even a substantial portion of these operations involve its California members or California associations, Plaintiff has not distinguished those activities from activities that NAR takes with its members nationwide. *See Williams*, 851 F.3d at 1020–21 ("*Daimler* rejected a theory that would permit 'the exercise of general jurisdiction in every State in which a corporation "engages in a substantial, continuous, and systematic course of business."'" (quoting *Daimler*, 571

8

U.S. at 138–39)).

Moreover, NAR submits evidence that it does not operate the Realtor.com site. Move is independently responsible for operating the site. *See* 1996 Agreement ¶¶ 3.4, 5.7(b),(c). Though NAR has ultimate authority over the site and the advertising plan, *id.* Sched H, ¶ 12; FAC ¶ 23, this relationship appears to be no different than any contractual relationship in which one party hires another to perform certain of its operations. Such a relationship is not as extensive as a subsidiary/parent relationship, which on its own would be insufficient to show general jurisdiction. *See Williams*, 851 F.3d at 1021.

And Plaintiff does not allege or submit evidence sufficient to satisfy the alter-ego test set forth in *Williams*. Though NAR has "significant influence" over Move and has some corporate ties to and power over Move, FAC ¶ 35, this evidence is not sufficient to show that Move and NAR are essentially the same entity or that it would be unjust to consider them to have separate identities.

As to NAR's remaining contacts with California, again Plaintiff has not demonstrated that these contacts are sufficiently different than NAR's contacts with other states. *See id.* at 1021–22. Though Plaintiff alleges that NAR has approximately 200,000 members in California, a regional vice president in California, and conducts regular business here, FAC ¶ 18, there is nothing distinguishing this business from NAR's business throughout the United States. Indeed, NAR is nationwide, including in Florida, where Plaintiff is a member.[3]

Thus, Plaintiff has not demonstrated that NAR is subject to personal jurisdiction in California. Because Plaintiff was provided leave to amend on this issue, *see* ECF 55, the Court concludes that any future amendments would be futile. NAR's motion is GRANTED WITH PREJUDICE to refiling the claim in California. Plaintiff may refile her claim in a district that has personal jurisdiction over NAR.

---

[3] At the hearing on the motion, Plaintiff also appeared to argue that NAR has waived its right to argue that it is not subject to personal jurisdiction here because the 1996 Agreement contemplates that disputes arising under the contract will be litigated in California. But Plaintiff cites no case for the proposition that agreeing to a forum selection clause in a single contract waives personal jurisdiction arguments in cases unrelated to that contract. The Court thus rejects this argument.

United States District Court
Northern District of California

### III. MOTION TO COMPEL ARBITRATION

Move asks the Court to compel Plaintiff's TCPA claim to arbitration and dismiss or stay the case pending arbitration. *See generally* MTC. The Court first discusses the additional relevant facts, then the applicable law, and then the result here.

#### A. Additional Facts

As discussed, Realtor.com allows consumers to find property listings, and it also connects consumers to real estate agents who might be able to assist them. Jay Decl. ¶¶ 2, 3, ECF 27-4. Real estate professionals who have purchased one of Move's lead-generation products can be connected with these consumers. *Id.* ¶¶ 4–5. Plaintiff is a licensed real estate professional with over sixteen years' experience in the industry, who, according to her Linked-In profile, teaches contract and negotiation classes. McGrath Decl, Ex. 1, ECF 27-1. In both 2015 and 2016, Plaintiff purchased one of these products—the "Connections" service (called both "Connections for Co-Brokerage" and "Connections for Buyers" at various times). Jay Decl. ¶ 6; McGrath Decl. Ex. 1. To purchase Connections, Plaintiff had to place her order over the phone with a Move account executive. Jay Decl. ¶ 7. These account executives are "trained to inform Connections purchasers that they will receive an email containing written confirmation of their order and providing all of the details and important information about their purchase and agreement with Move." *Id.* ¶ 8.

In October 2015, Plaintiff called Move to order Connections for a one-year term. Matthews Decl. ¶ 2, ECF 27-2. After the call, Move emailed Plaintiff an order confirmation, which included details about her purchase as well as the terms and conditions. *Id.* ¶ 3 & Ex.1. In October 2016, Plaintiff again called Move to purchase Connections for another one-year term. *Id.* ¶ 5. Move again emailed Plaintiff a confirmation email containing the terms and conditions of her purchase ("Connections Agreement"). *Id.* ¶ 6 & Ex. 2. In this email, under the heading "Order Details," the email stated, "For the terms and conditions that apply to your order, please click here. By accessing or using any product or service included in your order and/or by not cancelling your order [within three days], you agree to these terms and conditions." *Id.* This whole sentence was in black font except the words "click here," which were in blue font and hyperlinked directly to

"Move Sales, Inc. Terms and Conditions" ("TOC"). *Id.* ¶¶ 6, 7 & Ex 2.

Move's TOC state that they "apply to every Order," defined as "a purchase by You from Move of a Product," and they "apply to the provision of any Content by You to Move, regardless of whether or not such Content is provided in connection with an Order," with Content defined as "all content and materials that You provide to Move, including, without limitation, Customer Content, Profile Content, and Property Content." *Id.*, Ex. 3 ("TOC") at 1. "Profile Content" is defined as "any content, data, images, and other materials that You provide to Move pertaining to You, Your firm or office, or any person or entity employed by or affiliated with Your firm or office." *Id.* at 2. The TOC state that they are governed by California law. TOC ¶ 19.1.

Under a heading entitled "Applicable Law; Agreement to Arbitrate," in a subheading entitled "Agreement to Arbitrate," the TOC contain in all capital letters, in relevant part, the following arbitration provision:

> You and Move agree that any and all disputes or claims that may arise between you and Move shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act shall govern the interpretation and enforcement of this section 19. You agree that You and Move may bring claims against eachother only on an individual basis and not as part of any purported class or representative action or proceeding. . . . The arbitration will be conducted by the American Arbitration Association ("AAA") under its rules and procedures, as modified by this section 19. The AAA's rules are available at www.adr.org. . . . The arbitrator's award shall be final and binding and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules, unless otherwise stated in this section 19.2. If a court decides that any part of this section 19.2 is invalid or unenforceable, the other parts of this section 19.2 shall still apply.

TOC ¶ 19.2 (emphasis omitted). Plaintiff never attempted to cancel her Connections Agreement during the term of the contract. Matthews Decl. ¶ 8.

Independent from the Connections service, Move gives real estate professionals the ability to receive text alerts containing information that might be of interest to them. Blakely Decl. ¶ 2, ECF 27-3. While she was a Connections customer, Plaintiff submitted the required information to Move to sign up for text message alerts and subsequently opted in to Move's text message program. *Id.* ¶¶ 4–10. She allegedly later opted out. FAC ¶ 56–60.

## B. Legal Standard

The Federal Arbitration Act ("FAA") applies to arbitration agreements affecting interstate commerce. 9 U.S.C. §§ 1 *et seq.* When it applies, the FAA preempts state laws that conflict with its provisions or obstruct its objective to enforce valid arbitration agreements. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 341–43 (2011). The FAA reflects a strong policy in favor of arbitration. *Concepcion*, 563 U.S. at 339; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street*, 35 Cal. 3d 312, 322 (1983). Under the FAA, contractual arbitration agreements must be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract." *Newton v. Am. Debt Servs., Inc.*, 549 Fed. App'x. 692, 693 (9th Cir. 2013) (quoting 9 U.S.C. § 2). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Concepcion*, 563 U.S. at 339 (internal citations omitted); *Weeks v. Crow*, 113 Cal. App. 3d 350, 353 (1980) ("The court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made." (citation omitted)). "[W]here a contract contains an arbitration clause," moreover, "courts apply a presumption in favor of arbitrability . . . and the party resisting arbitration bears the burden of establishing that the arbitration agreement is inapplicable." *Wynn Resorts v. Atl.-Pac. Capital, Inc.*, 497 Fed. App'x. 740, 742 (9th Cir. 2012).

When faced with a petition to compel arbitration, the district court's role is a discrete and narrow one. "By its terms, the [FAA] 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis added). The court's role under the FAA is limited to determining "two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. Aug. 11, 2015). "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron*, 207 F.3d at 1130

(citations omitted).  The party seeking to compel arbitration bears the "burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence."  *Norcia v. Samsung Telecomms Am., LLC,* 845 F.3d 1279, 1283 (9th Cir. 2017) (citation omitted).  In analyzing whether a contract exists, courts "apply ordinary state-law principles that govern the formation of contracts."  *Id.*

However, parties can also "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."  *Rent–A–Ctr., West, Inc. v. Jackson*, 561 U.S. at 63, 68–69 (2010).  "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (internal citations omitted).  The question of arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).  For arbitration agreements under the FAA, "the court is to make the arbitrability determination by applying the federal substantive law of arbitrability absent clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law."  *Brennan*, 796 F.3d at 1129 (internal citations and quotation marks omitted).

### C.  Discussion

Move argues that the Court must compel arbitration because there was a binding contract with a valid arbitration clause (embodied in the TOC) that clearly and unmistakably delegates questions of arbitrability to the arbitrator under the Supreme Court's recent decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019).  Plaintiff argues that she did not agree to any contract requiring arbitration here for four reasons: (1) the TOC do not clearly and unmistakably delegate questions of arbitrability to the arbitrator; (2) the Connections Agreement had expired at the time the text messages were sent;  (3) the Connections' Agreement does not cover the text messages sent in 2018 because they were unrelated to the Connections service; and (4) the Agreement is unenforceable browsewrap.  *See generally* MTC Opp., ECF 53.

Plaintiff does not argue that the Agreement is unconscionable.

Because both parties heavily reference the Supreme Court's decision in *Schein* the Court briefly describes the holding of that case here. In *Schein*, the Supreme Court provided guidance on the question of who—the Court or the arbitrator—decides "whether [an] arbitration agreement applies to [a] particular dispute." 139 S. Ct. at 527. The Supreme Court instructed that the answer is "a question of contract law." *Id.* "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Id.* at 531. If the contract "clear[ly] and unmistakab[ly]" delegates this question to the arbitrator, *id.*, "a court may not override the contract." *Id.* at 529. "In those circumstances, a court possesses no power to decide the arbitrability issue." *Id.*

The Court now turns to Plaintiff's formation arguments (arguments 1 and 4) and then discusses her applicability arguments (arguments 2 and 3).

### 1. The TOC Clearly and Unmistakably Delegate Questions of Arbitrability to the Arbitrator

Plaintiff first argues that the Court should decide the arbitrability of the dispute because the TOC do not clearly and unmistakably delegate the question of arbitrability to the arbitrator. *See* MTC Opp. at 7. Plaintiff argues that the following provision of the arbitration agreement indicates that the parties did not clearly and unmistakably agree to delegate questions of arbitrability to the arbitrator: "If a court decides that any part of this section 19.2 is invalid or unenforceable, the other parts of this section 19.2 shall still apply." TOC ¶ 19.2. Because the arbitration provision clearly contemplates the "court" deciding questions of invalidity and unenforceability, the parties did not agree to allow an arbitrator to address those questions.[4] Move refutes this. *See* MTC at 8–10.

As an initial matter, the TOC make clear that the Court should determine the arbitrability issue by applying federal substantive law because the TOC are covered by the FAA. The

---

[4] Plaintiff also argues that the parties did not clearly and unmistakably delegate the arbitrability question because the TOC do not cover the underlying actions here. *See* MTC Opp. at 7. This argument is more properly discussed with respect to Plaintiff's second and third arguments regarding the applicability of the arbitration provision.

arbitration provision states in relevant part "[t]he Federal Arbitration Act shall govern the interpretation and enforcement of this section 19." TOC ¶ 19.2. Plaintiff does not argue otherwise. *See generally* MTC Opp.

The Court agrees with Move that the TOC "clearly and unmistakably" delegate questions of arbitrability to the arbitrator. *Howsam*, 537 U.S. at 83. The TOC expressly incorporate the AAA rules. *See, e.g.*, TOC ¶ 19.2 ("The arbitration will be conducted by the American Arbitration Association ("AAA") under its rules and procedures, as modified by this section 19."). The Ninth Circuit in *Brennan v. Opus Bank* held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability," at least where the contracting parties are both sophisticated. 796 F.3d 1125, 1130 (9th Cir. 2015). There, plaintiff was a sophisticated executive who signed an employment agreement with his employer. *Id.* at 1127; *see Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 (9th Cir. 2013) ("[A]s long as an arbitration agreement is between sophisticated parties to commercial contracts, those parties shall be expected to understand that incorporation of the UNCITRAL rules delegates questions of arbitrability to the arbitrator."). Plaintiff can fairly be characterized as a sophisticated party—she has over 16 years' experience in the complex real estate industry, and she teaches contract and negotiation classes. As such, incorporation of the AAA rules into the TOC provides clear and unmistakable evidence that the parties agreed to delegate arbitrability to the arbitrator.

The language Plaintiff points to does not change this result. The court in *Brennan* rejected a similar argument, where the arbitration provision expressly did not cover "any claim for equitable relief." *Id.* at 1131. The Ninth Circuit held that even though the conscionability of an agreement is an equitable matter under California law, the disclaimer of claims for equitable relief did not control because such an interpretation "would directly contradict" the clear and unmistakable intent to delegate indicated by incorporation of the AAA rules. *Id.* That is, not only did the language not create ambiguity, but also the Ninth Circuit interpreted it to be consistent with the incorporation of the AAA rules. So too here. The cited language from Section 19.2 can be read to mean that if the Court were to find the Delegation Provision (*i.e.*, the incorporation of the AAA rules) invalid or unenforceable, which it does not, then the remainder of the section is

15

severable. Likewise, while the AAA rules are incorporated as a substantive element of the arbitration provision, the language Plaintiff points to is included in a severability provision only. This fact similarly indicates that the parties clearly and unmistakably intended to delegate arbitrability via incorporation of the AAA rules.

For these reasons, questions of arbitrability are for the arbitrator under this contract.

### 2. The Agreement Is Not Unenforceable Browsewrap

Plaintiff next argues that she could not have agreed to the TOC because she did not have notice of them because they were sent as an inconspicuous hyperlink in a confirmatory email after she had signed up for the Connections service on the phone. *See* MTC Opp. at 13–19. Plaintiff describes the hidden TOC link in the confirmatory email as "unenforceable browsewrap." *Id.* at 13. Move argues that the agreement was not browsewrap and that Plaintiff had notice of the TOC and agreed to them through her use of the Connections service after receiving this notice. *See* MTC at 9–10; MTC Reply at 3–8.

The Court first describes the law with respect to browsewrap agreements and then analyzes the facts here.

#### a. Browsewrap Law

The Ninth Circuit's decision in *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) is the preeminent authority on browsewrap law in this Circuit. In *Nguyen*, the Ninth Circuit determined that the plaintiff had not agreed to the defendant's terms of use (and the arbitration clause therein) by purchasing a product on the defendant's website, even though the terms were displayed on every page of the website and on each page of the website's online-checkout process. The court rejected the defendant's argument that "the placement of the 'terms of use' hyperlink on its website put [the plaintiff] on constructive notice of the arbitration agreement" such that the plaintiff's "subsequent use of the website[] was enough to bind him to the Terms of Use." *Id.* at 1174–75, 1178–79.

In reaching this conclusion, the court first set forth the basic legal framework governing online contracts:

Contracts formed on the Internet come primarily in two flavors: "clickwrap" (or

"click-through") agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. . . . Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . a party instead gives his assent simply by using the website. . . . The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists.

*Id.* at 1175–76 (citations, alterations, and internal quotation marks omitted). The Ninth Circuit noted that courts are "traditional[ly] reluctant to enforce browsewrap agreements against individual consumers." *Id.* at 1178.

The Ninth Circuit then set forth the foundational rule governing browsewrap agreements: "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen*, 763 F.3d at 1176 (citation omitted). In line with this rule, the court noted that "[w]ere there any evidence in the record that [the plaintiff] had actual notice of the Terms of Use or was required to affirmatively acknowledge the Terms of Use before completing his online purchase, the outcome of th[e] case might be different." *Id.* "Indeed," it said, "courts have consistently enforced browsewrap agreements where the user had actual notice of the agreement." *Id.* (citing cases). The court also noted two other scenarios in which courts have been willing to enforce browsewrap agreements: First, "where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." *Id.* And second, based on an "inquiry notice" theory, "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." *Id.* at 1177.

Ultimately, the court held that the defendant's website did not meet any of these requirements, indicating that the plaintiff did not have notice—actual, constructive, or inquiry—of the terms and thus that the plaintiff had not agreed to be bound. *Id.* at 1178–79. The court

17

emphasized that "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 1179; *accord McGhee v. N. Am. Bancard, LLC*, 755 F. App'x 718, 719 (9th Cir. 2019) ("The onus fell on [the defendant] to put its customers on notice of the binding terms of the contract in a clear and straightforward way."). It concluded that "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Id.*

### b. Analysis

Plaintiff argues that under this law, she cannot be bound by the TOC. Specifically, she avers that she did not have actual notice of the TOC until Move filed its motion to compel. Silverman Decl. ¶ 7, ECF 53-2. And she asserts that she did not have inquiry notice because the link to the TOC in the email was inconspicuous.[5] *See* MTC Opp.

As an initial matter, the Court finds the browsewrap caselaw to be an ill fit here because the Connections Agreement was not a "[c]ontract[] formed on the Internet" through an unwitting consumer's use of a website. *Nguyen*, 763 F.3d 1175–76. Instead, Plaintiff was required to call Move to sign up for the contract, during which she spoke to a Move account executive about her desire to purchase the service. *See* Jay Decl. ¶¶ 7, 8. The email she received with the TOC was not the only interaction she had with Move. The Court finds Judge Fitzgerald's decision in *Herkenrath v. Move, Inc.* persuasive on this point. Case No. cv 18-4438-MWF (C.D. Cal. Aug. 21, 2018), Ex. 6, ECF 27-1. In that case, Judge Fitzgerald found the exact same Connections Agreement, conveyed to the plaintiffs in the exact same way (through email confirmation), was not a browsewrap agreement. *See id.* at 6.

But the browsewrap caselaw is simply a specific application of a broader proposition of law: a party cannot agree to a contract if she has no means of knowing what she is agreeing to. *See Nguyen*, 763 F.3d at 1175. That is because "mutual manifestation of assent, whether by written or spoken word or by conduct is the touchstone of contract." *Id.* (alteration omitted)

---

[5] Plaintiff also raises an argument that she did not agree to arbitrate this action because the Connections agreement was expired at the time of the events at issue here. *See* MTC Opp. at 14, 18. The Court addresses this argument *infra* when it discusses her broader argument on that same point.

(quoting *Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)). As such, the question of whether Plaintiff had notice (be it constructive, inquiry, or actual) is still relevant.

The Court finds that Plaintiff had at least inquiry notice of the TOC. Though Plaintiff did not have actual notice of the TOC, she does not dispute that the Move account executive to whom she spoke on the phone informed her that she would be receiving written confirmation of her order and that it would contain "all of the details and important information about [her] purchase and agreement with Move." Jay Decl. ¶ 8. And this admonition makes sense: The Connections service is fairly extensive, requiring monthly payments in return for specific services available through the website. *Id.* ¶¶ 4–6. This admonition constitutes inquiry notice that she would subsequently be receiving the terms of her agreement (*i.e.*, the TOC). *See, e.g.*, *In re Samsung Galaxy Smartphone Mktg. & Sale Practices Litig.*, 298 F. Supp. 3d 1285, 1297 (N.D. Cal. 2018); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1105 (C.D. Cal. 2002).

Despite having this notice, she continued to use the service and did not cancel within three days, which constitutes her acceptance of the TOC. *See* Matthews Decl., Ex. 2 (email indicating that use of service constitutes acceptance); *id.* ¶ 8 (avering that Plaintiff did not cancel the service); *see, e.g.*, *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D. Cal. Apr. 1, 2005) (describing how party accepted contract because he knew that continued use of the service would be deemed to be acceptance). Moreover, any failure by Plaintiff to review the confirmatory email or the TOC does not change the fact that the Agreement is enforceable against her because she had notice that she would be bound by the TOC. *See Nguyen*, 763 F.3d at 1179; *see also Vernon v. Drexel Burnham & Co.*, 52 Cal. App. 3d 706, 714 (1975) ("[F]ailure to read a contract before signing is not in itself a reason to refuse its enforcement." (citation omitted)).

As such, Plaintiff had notice of and agreed to the terms of the TOC, which were not an unenforceable browsewrap agreement.

### 3. Under *Schein*, the Arbitrator Must Decide If the Contract Covers the Time Period and Events at Issue Here

Finally, Plaintiff argues that the arbitration clause does not apply to the actions at issue

here for two reasons: (1) "the purported arbitration Agreement had expired when the texts at issue were sent," MTC Opp. at 8 ; and (2) "the texts at issue were neither sent nor agreed to pursuant to the Agreement or the Connections order term," *id.* at 11.  Move argues that under *Schein* the answers to these questions are solely for the arbitrator to decide.  MTC at 10–11.

The Court agrees with Move.  *Schein* makes clear that once the Court has decided that the parties clearly and unmistakably delegated issues of arbitrability to the arbitrator, the Court has no role in deciding whether the arbitration provision applies to the events at issue.  *See Schein*, 139 S. Ct. at 528 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.").  Included in the arbitrability question is "whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."  *Id.* at 529.  Plaintiff's arguments about whether the arbitration provision covers the events here falls directly within those questions reserved for the arbitrator.  Indeed, in each of Plaintiff's cited cases, the court was deciding the question of arbitrability of the dispute—the exact question the Court has determined is for the arbitrator here.  *See, e.g.*, *Nolde Bros., Inc. v. Local No. 358, Bakery Confectionery Workers Union*, 430 U.S. 243, 249, 255 (1977); *Savage v. Citibank N.A.*, No. 14-CV-03633-BLF, 2015 WL 2214229, at *4 (N.D. Cal. May 12, 2015); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012); *Ajida Technologies, Inc. v. Roos Instruments, Inc.*, 87 Cal. App. 4th 534, 546 n.8 (Cal. Ct. App. 2001).

Because Plaintiff's arguments are for the arbitrator to decide, they do not preclude the Court from compelling arbitration here.  The Court having held that Plaintiff agreed to a valid delegation provision, Move's motion to compel arbitration is GRANTED.

### D.    A Stay of This Action Is Appropriate

Move requests that the Court compel Plaintiff's individual claim to arbitration and stay the claim and class claims here, pending the arbitrator's decision on arbitrability of the dispute.  If the arbitrator decides that Plaintiff's claim is arbitrable, Move asks the Court to dismiss the action, including the class claims.  Plaintiff does not dispute that the arbitration provision includes a valid class action waiver.  *See* TOC ¶ 19.2 ("You agree that You and Move may bring claims against

eachother[sic] only on an individual basis and not as part of any purported class or representative action or proceeding."); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621–22, 1632 (2018) (upholding validity of class action waivers in arbitration agreements).

The Court agrees with Move that this is the proper procedure here and STAYS the case.

## IV. ORDER

Based on the foregoing, NAR's motion to dismiss is GRANTED WITH PREJUDICE to refiling in California because the Court lacks personal jurisdiction over NAR. Plaintiff may refile her claim in a district that has personal jurisdiction over NAR. Move's motion to compel arbitration is GRANTED and this action is STAYED until the arbitrator determines whether the arbitration provision covers Plaintiff's claim here. The parties are to submit a joint status report re arbitration every 120 days from the date of this Order, informing the Court of the progress of the arbitration. Within 14 days of the arbitrator's decision as to whether the arbitration provision applies to Plaintiff's claim, the parties shall submit a status report to the Court informing it of the arbitrator's decision. If the arbitrator determines that Plaintiff's claim is covered by the arbitration provision, the Court will dismiss this action. The initial case management conference set for July 18, 2019 is VACATED.

**IT IS SO ORDERED.**

Dated: June 24, 2019

BETH LABSON FREEMAN
United States District Judge